Good afternoon, everyone. The first case is TransTech Industries. Mr. Andrews, are you ready to proceed? I am. Your Honor, may we request three minutes of rebuttal time? All right. Thank you, Judge. This is our application to reverse the District Court's affirmance of the arbitrator's decision. Can I ask just a question on jurisdiction at the outset? Because I'm a bit lost, but maybe you can set me straight. This case started off as a circle action in 1990. Is that correct? A case started off in 1990 as a circle action. That's correct, Judge. So that would be 1331 jurisdiction, federal question. But this case relates to an agreement, a lawsuit, between TransTech and SCA. And that is a federal question. Your Honor, the agreement is actually an outgrowth of several different lawsuits, and it resolves several different lawsuits, one of which is the federal lawsuit that you have referred to. But it's whether arbitration applies or doesn't apply, et cetera, or whether the arbitrator did something that would allow the arbitration award to be overturned, but it relates to a contract, a settlement agreement, if you will, between SCA and TransTech. Is that right? That is correct. That's not a federal question. So you have to have diversity, right? Well, in and of itself, Your Honor, it's not a contract itself, and its construction is not a federal question, but it was in settlement of several different lawsuits, one of which included the lawsuit that you have referred to. But that doesn't give you a federal question. In other words, you and I can settle something. We can have a dispute about something that may, once upon a time, have dealt with a federal law. But our contract would be subject to some state law that we would pick. Except in this regard, Your Honor, the settlement was regarded by the district court when we approached the district court as an outgrowth of that continuing lawsuit. Even though that lawsuit was put into an inactive status, it still retained and still does retain that docket number. Why didn't you file it under that old docket number? It was a motion to enforce a settlement of that lawsuit, and portions of that lawsuit. It settles other portions as well. It does settle the claims. If you had gone under that old docket number, the question that Judge Ambrose is asking probably wouldn't be out there. I'm sorry. You filed a new suit, did you not? Well, we filed a new suit in state court. Actually, we didn't. Our adversaries did. Your adversaries did. Which was then dismissed, because all parties agreed that we would proceed by way of motion in the existing federal lawsuit, and it was accepted by the federal district judge on that basis, because it did resolve the issues that had been. But it was given a new number. That is correct. Okay. You're suing on an agreement, and they filed in state court, so you removed the federal court? No, we did not remove it. We filed our motion in federal court, and it was accepted in federal court by the district judge on that basis. The suit that had been initiated in state court was then dismissed by agreement between the parties. But even if you tried to do that, I mean, I guess I'm analogizing from Supreme Court cases like O'Connor and others, in which it says if you and I have a dispute and we have a settlement agreement, and then we get rid of the, we tell the judge, okay, the case is over, and then I, as a result of that settlement agreement, I somehow violate it. I think the Supreme Court in Kokona says you have to file, you have to file against me a new suit. You can't just go into the court and say reopen the old case. So I think it sounds to me like you did the right thing here by giving it a new number. My question is how do you have, how do we have jurisdiction? Although not pled, because it was not asked to be pled, it was regarded again just as a motion by the federal district judge. You do have the issues under the FAA which are being addressed. In addition to which, and I'm not absolutely certain about this off the top of my head, but Transtec and, and I would have to be careful about this because I think that Transtec and certain others of the plaintiffs in our action here are Delaware corporations and that SCA is not. I'm not absolutely certain about that. No, they're both Delaware corporations. I'm not sure if they are, Judge. I thought they both were once, once they're, they're doing principal place of business in different states. But 1332 I think says that you are in effect domiciled where you have your organized and where you have your principal place of business. So you could try to get it either way. But if you got two Delaware corporations, if that's correct, then you've got a diversity problem. Yeah, no, I understand. And I did, I do not recall the state of incorporation of either Transtec or Fieldcrest or Kenbuck, which are the other named parties. I can't give a definitive answer to that as to whether they are or not diverse, but we did again file it as a motion pursuant to a settlement of the preexisting suit. And it was received as a motion by the federal district court that the issue of jurisdiction, in fact, was not raised. And I understand you're raising it now. And the best answer I have at this point... Yeah, I mean, simply because we have to be sure we have it. Maybe, I was going to say, maybe you could try to hook your hat on the Federal Arbitration Act, perhaps. Yeah, that's what I tried to just refer to. As saying that that's federal question jurisdiction. But it seemed to me that the dispute here is over a settlement agreement. That's what I keep coming back to. Well, the dispute is over a settlement agreement, but it seems to vacate an arbitrator's decision, which was rendered in accordance ostensibly with the FAA. So I think when we look at it in that respect, it does present a federal question as to the application of the FAA to what this arbitrator did in particular. We are not actually suing to enforce or not enforce a contract. We are... A suit was filed, or an action, a motion was filed to confirm the arbitrator's award. We responded with our motion to vacate it. So the issue was not a suit on a contract, but the issue was confirmation or affirmation of the arbitrator's award. And I think that would constitute a sufficient federal question to give us jurisdiction. Very good. We'll discuss this matter, and if we decide we need further briefing, we will let you know. We'll start you off at the beginning. We'll put 12 minutes back on, please. Thank you, Your Honor. Good. I know for... There are a lot of issues here. At least for myself, the functus officio issue, I think, is the most interesting to me. I just want to make sure that you hit that. In fact, it may be your strongest argument of all the ones that you've raised. I will do just that, Your Honor. I think we have a pretty good idea of the facts in this case. With regard to the functus officio situation, Your Honor, we contend that there is a threat of fundamental arbitrariness, complete disregard of the scope of the arbitrator's assignment, and that he rewrote the agreement and dispensed his own brand of justice throughout the other issues that he raised, the inclusion of the insolvents, for instance, or the inclusion of a cancel recovery. That is what is most apparent in the calculation of the tax deduction. When he rendered his first decision, it was very clear that... But how is that exceeding his power? That's what functus officio is about, right? When he doesn't exceed his power, Your Honor, until he renders the second decision. When he renders the first decision, it is very clear in that paragraph in his first decision that he concluded and rightfully so that this was to be a calculated tax liability and was not going to be based on actual payments or actual settlements. Was it clear, though? Wasn't it ambiguous? The way that he... Didn't he render his opinion in an ambiguous way? I don't believe so at all, Your Honor. I think that it was very clear that he understood and acknowledged and so stated in his decision that it is a calculated tax liability. And when he did that, he included the calculation of X. If we go back to that paragraph 5.1b, there are three components that are to be calculated and applied. What he did, however, was once he received that tax preparer's certificate, and I will note that he did when he rendered his first decision put a legend at the bottom which said that he was retaining jurisdiction, but he was retaining jurisdiction for the sole purpose of receiving that tax preparer's certificate in accordance with his first decision. We did just that, but when we did that, it was clear that there was going to be no payment to SCA, and that disturbed him. And with nothing further, then he changed his decision. How do we know that it's a reversal? We know by simply looking at the language of the two paragraphs. One paragraph states that it is to be a calculated tax liability. The second decision says that it is not to be a calculated tax liability, that it's to be the actual tax. The first one says that it is not to be a payment or a settlement with the Internal Revenue Service, and the second one says that's exactly what it's supposed to be, that it is to be a payment. Now, with regard to that first decision, that first decision also paid attention to the clear language of 5.1b in the settlement agreement. Well, was it clear? Because the section starts off the sum of X, the amount paid or owed for income tax purposes. That's got to be actual tax. It's got to be actual tax. Your Honor, if we were to stop right there, I would agree. But that means that we ignore the rest of that paragraph. The shall be computed language. I'm sorry, Your Honor? The shall be computed language. It's not just the shall be computed language, Your Honor. In addition to that, the calculation, and it was to be a calculated tax liability, was to be on account of adjustments, and I'm reading four lines down now, on account of adjustments to the taxable income of Transtex Consolidated Group. An audit had occurred for the years from 1981 to 1992. In each one of those years, the IRS would ultimately determine what additions there are to the income of Transtex for that particular year. What this calculation was supposed to do was to calculate the tax associated with the adjustment to income. That's exactly what the language says, and that's what he was telling us to do, to do a calculated tax liability. In addition, 5.1b, towards the end of it, tells us how it is that we ought to calculate not just the two gross-up figures, that's the Y and the Z, but to calculate X, which is the tax. And what that says is the federal and state tax rates utilized to determine X, not just Y and Z, but X, Y, and Z, shall be computed at the highest marginal federal rate and New Jersey state income tax rate in effect for the taxable year in which the recoveries are included in the taxable income of Transtex Consolidated Group. Now, what that meant was that you were to identify the increase in income and then calculate the tax associated with that increase in income for each one of those years, but to utilize the maximum federal rate in effect in a different year, in the year in which the recoveries were received, in 2002. Now, his first agreement, or rather his first decision, tells us to do exactly that, and that is what we did. When he receives it and sees that there is to be no payment made, then he changes it completely. Now, didn't SCA object at that time to the finding of the preparing certificate? Yes, they did, Your Honor. If SCA objected, can't you clearly infer from that objection that the arbitrator still had jurisdiction and that the functus officio argument didn't lie? I don't believe so, Your Honor, for a number of reasons, one of which is the only objection that they made was to the result. There was nothing put before the arbitrator which would change the interpretation of 5.1b. The only thing that they put forward was that there have been certain actual tax determinations made by the Internal Revenue Service, and they said how fair can this be because now we're going to have a very large tax liability calculated which is substantially in excess of the actual tax that's going to be paid. That statement is true, but that does not change the operation of 5.1b. Nor does it change the intent that the parties had when they entered into it. If, in fact, he had said, this is what I think this means in his statement, in his first decision, tell me what you think, all right? We'd be in a different circumstance. He did not do that. He said I understand that this is a calculated tax liability. The other element of this is that this says that the tax is to be applied on the adjustment to income. Now, what it doesn't mean is it doesn't mean that it's supposed to identify the actual tax to be paid because the actual tax to be paid will consider not just the increase in the income, but the deductions to be made to that by net operating loss carry-forwards, by investment tax credits, all of which TRANSTEC had available to them. But they always regarded those things as their assets and that SEA should not improve its situation by being able to avail themselves of those income tax credits. When he made his first decision, it was crystal clear that he was determining that it was a calculated tax liability. When he says I'm going to now define X in the second one, and he says X is now the actual tax payment, that is not a clarification. One of the ways that you can determine whether it is a clarification or not is to ask yourself, can I implement the second decision and have it remain consistent with the first decision? What we had to do, because we gave it to our tax preparer and said this is what the judge said to do, and the tax preparer rightfully responded by saying I can't do that. But the first decision was based on the first preparer's certificate, correct? I mean, that was what you alleged was the deduct for taxes. The first decision was based on... That was October of 2002, was that the first decision? That's correct. And so you were basing on the preparer's certificate saying what, there were about $6 million of tax liability, is that correct? No, there was $9 million with the decision. I'm sorry, that's not correct. There was $2.9 million worth of tax liability and there was $10 million worth of interest that accrued on that. But to answer your question more precisely, Your Honor, you indicated that his decision was based on the tax preparer's certificate exactly the other way around. His decision was based on all of the submissions that were made to him and his reading... But the tax preparer's certificate was one of them, correct? No, what he looked at was all of the submissions to him and the agreement, and he decided that this is to be a calculated tax liability and not based on the actual payments and settlements with the Internal Revenue Service. Then the tax preparer submitted his certificate based on that ruling. But the first tax preparer's certificate was dated what? I think it was appendix 129 or something like that. I thought it was like $6.7 million. But what was the date of that? $6.7 in the March. March of 2002, right? So the decision comes out, and among the things he took into account in giving his first decision was October of 2002. Then you come out in December of 2002 and say, in effect, the first tax preparer's certificate was incorrect. The $6.7 should now be something like $16... $16.6, almost $16.7. Well, not precisely. Let me be more precise in my response. When I say the first tax preparer's certificate, I'm referring to the one that was generated after he rendered his decision. That's why I've been referring to that. And those figures are different. Tax preparer's certificates had been prepared and submitted before that, and they contained errors, and we have admitted that they contained errors. What we did, however, is we submitted not just the tax preparer's certificates that had been submitted. We submitted all of the information with regard to what Paragraph 5.1b meant, and then he made his decision as to what 5.1b meant, not based on the... Go ahead. Yeah, not based on the tax certificates that had been prepared, but on the evidence from the draft and from all of the arguments of counsel, etc. And when he made that decision, it was not based on what had been submitted. Actually, something was submitted, as you indicated, a little back in 2002. That, we indicated, was in error and was not... According to... I'm looking at Appendix 129 for the first one and Appendix 753 for the second one. It shows there's about a $10 million difference between the first and the second preparer's certificate that you're claiming as a deduction for tax liabilities. What in the world happened? I realize you're saying it's tax-loss carry-forwards that weren't taken into account, but it doesn't look too good. Well, Your Honor, in addition to which, we had the entire amount in there, okay, in terms of calculating everything. We had all the... We did not have the entire amount. We had the other deductions that were done in accordance with what we perceived were required by the agreement. But to make my point, to clear up this controversy, the decision that was made by the judge was not one which relied on those previously filed tax preparer certificates. By the arbitrator or by the judge? By the arbitrator, excuse me, the arbitrator. The arbitrator made his decision about what was required in 5.1b. That was the first decision. The second decision departed dramatically from that. Now, I understand that. It read out of the agreement the provision that I've just mentioned as to how it was to be calculated. And it also read out of the agreement the intent that this was to be a calculated tax liability. Yeah, but let's go back, let's go back. As I understand it, after the decision, on November 20, 2002, TransTex submitted a letter to the arbitrator saying that the status of your tax liability was as yet to be determined. And then there was information that there was going to be a federal audit, and at least in one state it was not yet determined. So things were in flux at that point. There wasn't a fixed figure at that point. Is that right? That much was correct, Your Honor. Then we were further directed to submit our tax preparer certificate, which we did, in accordance with his decision. Okay, and all that's after, okay, all that's after the arbitrator issued his decision. That is correct. He issues his decision based on what was in front of him. When he departed, not only did he violate functus officio because it is an absolute reversal of his decision... But, Mr. Andrews, just on that point, why wasn't it appropriate for him to insert the language that he retains jurisdiction over this matter pending its final resolution? Did you object to that? Not at all. Okay, now, if you didn't object to that, and that was clearly included in his first decision, why doesn't that mean that this case is still open before him and the functus officio argument that you've posited here just doesn't lie? Because the only reason that he retained that jurisdiction was to ensure that he received a tax preparer certificate. He could not... Well, that's what you're saying, but it doesn't say that here. Well, Your Honor, it could be the only reason for it because he was not anticipating taking any more testimony. He was anticipating that he was going to receive a tax preparer certificate that was going to be submitted to him in accordance with his ruling, and once he received that, if we follow it through, then he can render his final award. He can't render his final award until he gets that certificate. That was the only reason for it. There's nothing to put it another way in that statement where he retains jurisdiction indicating that he is going to entertain further argument as to how he should make his decision. It's just to receive the tax preparer certificate to implement his decision. Thank you, Your Honor. Good. Let's hear from Ms. Stone, and we'll have you back from your bow, Mr. Andrews. Thank you. Ms. Stone, we'll give you an additional 10 minutes if you would like it. Thank you. May it please the Court, good afternoon, Your Honors. Antoinette Stone for the FLE. I would like to just clarify one thing in connection with this whole notion of how the first award dealt with the tax liability issue, and I think we've dealt with it in our brief, but if you look at the first submission of Transtech to the arbitrator, it frames the contentions that are supposedly before the arbitrator in very specific ways. It purports to say that the contentions as they frame them are SEA's contentions, but in fact they're not. If you look at the fifth contention that they put in their initial submission, it talks about grossing up the amounts used to pay the tax liability. It doesn't talk about grossing up X. It talks about grossing up Y and Z. And when the arbitrator issued his first award, he addressed each of those contentions as they were framed by Transtech, including number 5. He dealt with that contention under the understanding that it dealt only with Y and Z, not X. And if you look at the contentions as they're raised by Transtech in their initial submission, it's clear that they didn't mean it to include any consideration of X. It's clear that they meant that it was only having to do with Y and Z. So I think you have to go back to the original submission in order to understand the full import of Judge Gaffney's original award. Secondly, I'd like to make the point that the arbitrator did, in fact, have the initial preparer's certificate from March of 2002 before him when he made his decision. It was attached as an exhibit to one of Transtech's submissions. I believe it was its initial submission. And also, I think you need to look at the fact that Transtech itself made the statement that its tax liability, defined as X in the agreement, was fixed and final as set forth in the initial preparer's certificate. If it was fixed and final, that statement is completely inconsistent with the position that Transtech is taking now, that X is some arbitrary amount that is artificially inflated. It's an amount that Transtech will never have to pay and will never owe. Transtech itself admitted that X was fixed and final. And you also note that the position that Transtech is taking now was taken only after the original award was entered. Before that time, it never took the position that X was anything other than the amount that Transtech would pay or owe, as it's defined in the agreement. What they later said is they miscalculated and that they should have taken into account tax loss carried forward that they initially did not take into account. Well, what they did say also is that they thought they were going to win on the Kemps law issue and on the attorney's fees issue, so it wasn't necessary to be particularly precise with respect to the tax liability, which is a great argument if I've ever seen one. They made that bet, so they have to lie in it. That's it. Correct. Unless you have additional questions about the tax liability issue, I'd like to move on or address any other questions you have about that. Well, why don't you address more specifically whether the arbitrator impermissibly changed his opinion? I realize you've outlined the reasons why not, but there were other arguments that were made in that respect as well. Yes, well, as I stated, the arbitrator was addressing contention five. Contention five dealt with Y and Z, not X. Therefore, the first award only dealt with Y and Z. So it was not an alteration of the original award? By no means. By no means. The first award had nothing to do with X, did not deal at all with X. And I think under those circumstances, a subsequent decision is not subject to the functus officio doctrine. It's a clarification or a decision on an issue that was not addressed in the original award. How do you interpret the retained jurisdiction clause? Well, when the arbitrator issued its initial award, it of course did not have the benefit of the revised prepared certificate. It didn't have the numbers that it would need in order to make a final decision on what the award would be. It needed those numbers in order to determine that SCA was entitled to a specific payment. I think at the very least, he retained jurisdiction for that reason. But Judge Gaffner, being an experienced arbitrator, maybe believed also that he needed to retain jurisdiction, even if there were questions about the award, as in fact there were. Did anybody challenge the initial retention of jurisdiction? We certainly didn't, and I don't recall that TransTech did either. Anything further? Go ahead. Yes, you have plenty of time. So you can use all or part of it. Okay. Just dwelling for a minute further on the tax payment issue, we've cited in our brief many, many instances in which TransTech itself referred to Y and Z with reference to, quote, the amount of the recoveries utilized for the payment of X. And Y and Z could not be the amount of the recoveries utilized for the payment of X unless you define X as the amount paid or owed. TransTech would never seek to gross up an amount that they never paid. And I think that the language of the agreement, as well as its representations in the SEC statements and its correspondence, and even in its arbitration filings, certainly confirms that. And if I could just refer to the filing that TransTech made. I believe it was its initial filing. And this is at the pages 805 and 806 of the appendix. TransTech says, a payment was to be made to Waste Management out of the insurance proceeds, but only after TransTech received appropriate deductions for the attorney's fees and calculated amounts to protect it from its anticipated tax liabilities. And we think that the only way you can interpret that, interpret the phrase anticipated tax liabilities is to interpret it as the amount that TransTech would expect to pay or owe. And further... But I guess what they're saying is that what they actually paid took into account tax loss carry-forwards that weren't really attributable to this particular transaction. Is that right? Well, the whole notion of the loss carry-overs goes into what the actual tax liability was for those years. I mean, the tax court considered the loss carry-overs in determining what the liability was for those specific years. I mean, the fact that it was applied retroactively doesn't change the fact that it went to determine what the tax liability for each particular year was. What about the legal fees issue? Didn't the arbitrator select the wrong legal fees for purposes of net recovers? You mean by applying the revised agreement as opposed to the retained agreement? Correct. What language in the settlement agreement gave them the right to look at anything else other than what was paid and what was part of the settlement agreement? What was part of the contingent fee agreement with the named law firm? Well, the agreement itself refers to attorney's fees that are paid or payable to the lawyers. It doesn't say might be paid or would be paid or will be paid. It says paid or payable. When the agreement was revised, the retainer agreement had no force in effect. Nothing would be payable under the retainer agreement once that agreement was revised. And I think the arbitrator saw that and determined that the only way he could rationally... Was the settlement agreement specifically revised with signatures by all parties or did you just merely change the retainer agreement by changing law firms? TransTech merely changed the retainer agreement without any notice to MCA. So they just changed... All right. So you didn't sign off on that. Oh, no. Not at all. All right. So, in effect, the settlement agreement would not have been revised without your specific assent to that revision. That's correct. But, Your Honor, you have to look at the fact that the revised agreement wasn't merely a revised agreement as to how TransTech's lawyers would be paid for the coverage litigation. It was a wholesale revision that not only paid the lawyers for the coverage litigation, but it paid them for the arbitration and other litigation. And that was never the deal. The deal was that TransTech's lawyers would be paid for the work they did in connection with the coverage litigation. Nothing else. And the so-called revised agreement changed the whole landscape on that. STA never agreed to allow the deduction for other fees. In the final analysis, does it make any difference what number the arbitrator used for legal fees? Yes. I think the swing is some $3.3 million versus $1.3 million. Yeah, but either way, don't you... Doesn't the number still come in over $4.667? Well, it depends. The denominator can't be any more than the amount stated. No, that's correct. But it depends on how the arbitrator dealt with the other variables, such as the tax... But my point is in the final... I mean, the numerator is $4.667 or net recoveries, $4.6 million or net recoveries, whichever is less. And the net recoveries, no matter what the legal fee was, would have been in excess of $4.6 million. So regardless of what the arbitrator found, it isn't going to make any difference on the numerator. I haven't done the math, but again, I think it does depend on what the tax liability is. If it doesn't, then you're right. All right. That is my point. Okay. With respect to the argument that the so-called KEMSOL recovery should be excluded from the total recoveries before calculating the SCA payment, I think the agreement is clear that all recoveries are to be considered and that there is no netting out of KEMSOL. The absence of all netting out of KEMSOL of any mention of the KEMSOL site in the settlement agreement itself is irrelevant. We weren't settling the KEMSOL litigation. We were settling the Kinbuck litigation. And there's no reason to take the position that the parties couldn't have considered applying the entire pool of recoveries to the SCA payment. SCA never agreed to an arbitrary allocation that was dependent on some internal insurance company formula that was never considered, and there's not a shred of evidence in the record that shows that SCA agreed to an unspecified, undetermined, and arbitrary allocation. The only times that the parties considered making a split between KEMSOL and Kinbuck were in drafts where they specified the exact percentage that would be allocated to Kinbuck and the exact percentage that would be allocated to KEMSOL. It wasn't left up to the insurance companies. And even in those situations, the maximum amount that would be allocated to KEMSOL was 10%, not 50%, as Transtad wants this Court to believe today. But your main argument is the plain language is all recoveries. It's not qualified. It's not qualified, no. I think that's the main argument, and that's the best argument. With respect to the insolvency issue, I confess I don't understand their argument because even in their own preparer certificates in every single one, insolvent recoveries were included in the calculation of the recoveries. Proceeds relating to? Insolvency. You claim the significant language is relating to? Relating to, that's correct. But even aside from that, Transtad itself included recoveries from insolvency in its preparer certificates. So I don't understand how they can make the argument that insolvent recoveries should be excluded when their own certificates include recoveries from insolvency. And in particular, I'm talking about the recoveries from First State and International, which appears at the very top of each version of the certificate. Those amounts were added to the total recoveries. They were added to the recovery from a settlement, from a Lloyds settlement. So I don't see how they can say that insolvent recoveries should be excluded. Let me just return for one second to the ChemSol site. If SCA, as I understand it, wasn't involved with the ChemSol site, correct? That's correct. So why should SCA, I guess the argument would be, why should SCA receive any recoveries, any proceeds from the insurance action as to the ChemSol site when you weren't involved with it at any time from the beginning to the end? The answer to that, I think, Judge Ambrose, is that TransTech took the position that it had very little in the way of assets to pay anything by way of settlement to SCA. It had a chunk of money that it expected to get from the insurance coverage litigation. Once that money became TransTech's property, when the insurance litigation settled, what difference does it make as to the source of that money? It was a source of money with which they could pay SCA. So you're saying for you coming in to take over the responsibility with respect to cleanup of Kinbuck that you were going to get any insurance proceeds whatsoever, and that was the deal, whether it be with ChemSol or Kinbuck or anything else? From that particular case, which happened to involve both sites, Kinbuck and ChemSol. Was there anything that was put into evidence at all by way of attorney understandings as to what all recoveries meant, that there was to be a division or no division between the two sites? Yes, absolutely. I mean, not only does the agreement itself make no reference to that. I'm saying in terms of leading up to the agreement. Right. Leading up to the agreement? In other words, were there discussions as to what all recoveries would mean when you were drafting this particular provision of the settlement agreement? You're saying that the plain language says all recoveries. That's correct. They're saying it doesn't. Is there anything that was between the parties beforehand that would indicate one way or the other? Yes. In, I believe it was the fall of 1997, a draft was exchanged between the parties that did away with any allocation between ChemSol and Kinbuck and just said that SEA would take 75 percent of the recoveries. Right. And more to the point, there was no mention at all that ChemSol, after that point, that ChemSol would have to be excluded from the recoveries. Transdex's own SEC filings made no distinction between ChemSol and Kinbuck recoveries. And it seems to me if it was important to them to make that distinction, they would have made it in their public disclosures. But nothing was mentioned about that. I would like to just touch for a minute on this argument that the arbitration was fundamentally unfair. I don't think there's any dispute that the parties agreed at the outset to the procedure that the arbitrator was supposed to apply here, and that was that he was to consider documentary submissions, and if he felt that there was a factual dispute, then it would be his decision to determine whether he needed testimony. No one disputes that that was the procedure. Transdex and SEA submitted, I think, 17 or 18 papers, briefs, to this arbitrator. There were 75 exhibits. There were several oral arguments. At no point did Transdex ever say, I want to put on so-and-so to testify about a particular issue. That was never said. And in all its subsequent filings after the award was entered, it's never told anybody what it wanted to put in, that it wasn't allowed to put in. We don't know what evidence they wanted to put in. We don't know what witness they wanted to present. It was never mentioned. They just say, oh, well, we did not have the opportunity. But there's no evidence that Judge Gaffney refused them the opportunity, and there's no evidence that they ever even requested the opportunity. So I think that's a completely agreed argument. Finally, with respect to the argument that Judge Gaffney didn't provide a written statement of reasons, I think the case law is clear that the arbitrator doesn't have to do that unless the parties agree in their contract that he should, which they did not do here. So it would have been nice, I guess, for TransTech to have a written statement of reasons. It would have given them more impress for the appellate mill, but the parties didn't agree to that. So I don't think that this Court can say that a written statement of reasons was required and override the parties' contractual agreement. That would conclude my argument, unless you have other questions, Your Honor. Anything else? Good. Thank you very much. Mr. Andrews? Thank you, Your Honor. May I just make one more point? Yes. This is a technicality, and it's of interest to the clerks. On page 18 of our brief, the reference to Appendix 13 should be to Appendix 913. 913. Yes. If I may, Your Honor, I want to correct certain misstatements and inaccuracies that were in the argument of my adversary. First, she makes reference to insolvents. First State and International as being insolvents as being included in the calculations that were made. First State and International are not insolvents. They were solvent insurance carriers that were included in the action. They were not insolvents. The other issue that I wanted to raise with regard to the insolvent issue is that both parties understood before the action was initiated that the insolvent London Market insurers had actually declared bankruptcy long before this agreement was entered into. They declared bankruptcy in England in a scheme of arrangement in 1993. The parties understood that the available insurance coverage had been reduced by the amount allocable to each one of those insolvent London Market insurers. In fact, London Market insurers' liability pursuant to a Lawrence policy is several, not joint. But then why didn't your agreement say something other than all recoveries? Your Honor, when we said all recoveries, if I may, I will refer to A154, which is a letter from Mark Manowitz that went to who was representing TransTech to Peter Kelly, who was representing SCA. In that letter, he indicates, the defendants in the coverage action, which are not part of Lloyd's, do not have the same economic issues as the London Market defendants. Insolvency has reduced the excess coverage available from the London Market. However, the remainder is more than sufficient when the parties entered into it. Now, this argument you're making to us, that was also made to the arbitrator? Yes, that is correct. That is in A154. So if the arbitrator then rules against you, and even if we were to agree with you and disagree with the arbitrator, under what guise can we come in and say that we can overturn it? I mean, it's really a very tough hill to climb to overturn an arbitrator's decision. It really is, Your Honor, and they are given significant power, but that power has to be exercised within the confines of their assignment. The assignment here was very specific. The key was to construe and apply the agreement and not depart from it. Isn't that what he did? For the exsolvency, he basically said that all recoveries, my guess is, all recoveries are all recoveries, therefore there isn't any take-out for the insolvents. Now, again, whether we agree or disagree, isn't that within his assignment? And he focused on the relating to language. I guess maybe you're saying it's related to the New Jersey suit. Right, Your Honor, and we've made that argument. If I may, I want to answer the issues that were raised by the comments with regard to the tax liability. The suggestion was that we had not raised the issue to the arbitrator before we got the decision that X was a calculated payment that is incorrect. And in our brief, we identified at A625, which is a September 3, 2002, submission to the arbitrator, at page 654, A654, 27 of that, we indicate that this is why we see the phrase, the federal and state tax rates utilized to determine X, Y, and Z shall be computed at the highest marginal rate. If we utilize or if we change the statement that he made to mean that there are actual payments used, what happens is you take out, eliminate, nullify completely the phrase on account of the adjustments to income and the fact that you would have calculated it in accordance with that maximum rate. The second agreement would have you calculate it in accordance or strike it, calculate it on a different amount utilizing a different rate. In addition to which, he came up with a new language not found anywhere in the agreement which said that the interest was to stop accruing at a certain date. It's not in 5.1 days. It's nowhere in there. He just created that. Now, it's the only instance in which he actually gave an explanation as to why he was doing that. What he did is he conjured up this in a footnote to the award, and he says in the footnote, Transpac may continue to refuse to pay its tax, which might cause that interest to continue to accrue and so defeat the claim of SCA. First, the hypothetical is incredibly contrived, but it demonstrates what we're trying to contend here, and that is that he put in his own personal brand of justice into this and departed from the agreement. That's what he's not allowed to do as an arbitrator. He was not allowed to change that decision, and he was not allowed to change it in such a way that ran roughshod over that agreement. When you couple that with his refusal to give us any statement of reasons and explain how it is that he reached these conclusions, that is sufficient to justify Victor. Thank you. Thank you very much, Mr. Andrews. This was very well argued. We will take the matter under advisement.